DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

| | |
|---|---|
| UNITED STATES OF AMERICA and<br>PEOPLE OF THE VIRGIN ISLANDS,<br><br>    v.<br><br>DELROY A. THOMAS,<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)  **Criminal Action No. 2015-0039**<br>)<br>)<br>)<br>) |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
  *For the Government*

**Nizar DeWood, Esq.,**
St. Croix, U.S.V.I.
  *For Defendant*

**Jenny L. Devine, Esq.,**
Tampa, FL
  *For Jason Navarro*

## MEMORANDUM OPINION

**Lewis, Chief Judge**

  THIS MATTER comes before the Court on Defendant's "Amended Motion to Suppress Statements and Recorded Phone Calls," filed on January 20, 2016, in which Defendant seeks to suppress "all statements made to a confidential informant, as well as statements made to DEA Agents on October 8, 2015." (Dkt. No. 17). Defendant contends that these statements were obtained in violation of his Sixth Amendment right to effective assistance of counsel and his Fifth Amendment right to due process. (*See id*.). The Government filed an Opposition on February 17, 2016. (Dkt. No. 22). An evidentiary hearing was held on May 24, 2016.

  At the hearing, Defendant requested additional time to provide the Court with case authority that supports his argument that the statements he made to a confidential source while detained at the Golden Grove Adult Correctional Facility were obtained in violation of his Sixth

Amendment right to counsel. Defendant also requested additional time to brief his claim that his Fifth Amendment right to due process was violated. By Order entered on May 25, 2016, the Court granted Defendant's requests. (Dkt. No. 91). Defendant filed his "Supplemental Brief in Support of Motion to Suppress" on June 13, 2016 (Dkt. No. 94), and the Government filed its "Response to Defendant's Supplemental Brief" on June 21, 2016 (Dkt. No. 97).

### I.  FACTUAL BACKGROUND[1]

On December 15, 2015, Defendant Delroy Thomas ("Defendant"), a former corrections officer at the Golden Grove Adult Correctional Facility ("Golden Grove"), was charged in a four-count Indictment with Use of Interstate Commerce Facility in Commission of Murder for Hire, in violation of 18 U.S.C. § 1958(a); Attempted Murder, in violation of 14 V.I.C. §§ 331(1), 922(a)(1) and 923(a); Attempted Retaliation Against a Witness, in violation of 14 V.I.C. §§ 331(1) and 1510(a)(1); and Possession of Prison Contraband, in violation of 18 U.S.C. §§ 1791(a)(2), (b)(3), (d)(1)(B). (Dkt. No. 1). At a suppression hearing held on May 24, 2016, the Court heard evidence and argument on Defendant's "Amended Motion to Suppress Statements and Recorded Phone Calls." Lieutenant Sidney Elscott of the Virgin Islands Police Department and Shelbie Beazer were called to testify by the Government. Jason Navarro was called to testify by the Defense.

The parties have stipulated to the following facts for purposes of the instant Amended Motion to Suppress:[2]

- Defendant was arrested by the Virgin Islands Police Department on July 10, 2014 for aggravated rape[,] and incarcerated [] at Golden Grove Adult Correctional Facility []. He remained at [Golden Grove] until July 18, 2014[,] when he was released.

---

[1] The Court bases the factual background in this section on the record established at a suppression hearing held on May 24, 2016. The Court provides this information solely for the purpose of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] A signed "Stipulation of Facts" was submitted to the Court by the Government at the evidentiary hearing on May 24, 2016.

2

- Superior Court [M]arshals arrested Defendant for [an] alleged violation of his pre-trial release on November 20, 2014[,] and incarcerated him at [Golden Grove]. He remained at [Golden Grove] until December 4, 2014[,] when he was released.

- Superior Court [M]arshals arrested Defendant on [an] alleged violation of [his] pre-trial release [] on February 2, 2015. He remained incarcerated at Golden Grove . . . from February 2, 2015 through March 20, 2015[,] when he was released.

- From the time of [Defendant's] arrest on July 10, 2014 to the time of his release on March 20, 2015, he has been represented by the Territorial Public Defender on the aggravated rape offense in the Superior Court.

- On October 8, 2013, Jason Navarro made his initial appearance before the Magistrate Court in St. Croix on false document related charges, and was released on bail.

- On October 11, 2013, Virgin Islands Police arrested Navarro for unlawful possession of a firearm. As a consequence, Navarro remained incarcerated at Golden Grove . . . until March 23, 2015, when he was released.

The following facts emerged from the record established at the suppression hearing. Lieutenant Sidney Elscott ("Lieutenant Elscott"), has been employed with the Virgin Islands Police Department for twenty-two years, and has been a member of the High Intensity Drug Trafficking Areas ("HIDTA") task force for eight years. Based on reports and information verbally given to him by Special Agent Tracey Gardner ("Special Agent Gardner") of the Drug Enforcement Administration ("DEA"), Lieutenant Elscott testified that Jason Navarro ("Navarro"), a former inmate at Golden Grove, was a confidential source for the DEA from October 2013 to March 2015. During that time, Navarro contacted his "handling agent," Special Agent Gardner by cell phone to provide her with "general knowledge of criminal activity." Although Navarro was not compensated for providing information, the DEA relocated him from the Virgin Islands as a result of the information he provided regarding the instant matter.

On March 9, 2015, Navarro called Special Agent Gardner to inform her that he had been approached by Defendant, who was also incarcerated at Golden Grove at the time, and that Defendant had asked him if he knew of a hitman that could kill the witnesses in his Superior Court

rape case.³ Upon receiving this information, Special Agent Gardner immediately began an investigation; verified that Defendant had a rape case in the Superior Court of the Virgin Islands; and verified that the names of the witnesses in the Superior Court rape case matched the names Navarro provided. With the assistance of Navarro, Special Agent Gardner recorded telephone calls between Navarro and Defendant. The telephone calls were three-way calls made by Navarro to Defendant, with Special Agent Gardner on the line. However, the sound on Special Agent Gardner's line was muted; she just listened to the conversations. Lieutenant Elscott, who became involved with the investigation on March 9, 2015, also listened to the recorded conversations.

During one of the recorded conversations, Navarro asked Defendant if he was serious about the murder-for-hire. Defendant responded in the affirmative. Navarro continued by telling Defendant that, if he was serious, he had to send him photographs of the witnesses that he wanted killed. Lieutenant Elscott testified that photographs of the witnesses were, in fact, sent by Defendant to Navarro, and that Navarro forwarded the photographs to Special Agent Gardner. Upon receipt of the photographs, the DEA identified—through the Virgin Islands Police Department and the Attorney General's Office—the individuals in the photographs as the minor victim in Defendant's Superior Court case and Felicia Bennerson, the victim's mother. Due to additional information gathered from the recorded telephone calls, the DEA became concerned about the safety of the witnesses, and removed them from their residence.

Navarro, the confidential source in this case, testified that he had his first encounter with Defendant in 2015, but that he had seen Defendant a couple of times before that encounter when Defendant was a corrections officer at Golden Grove. The first time Navarro recognized Defendant

---

³ On March 9, 2015, neither Special Agent Gardner nor Lieutenant Elscott knew of Defendant. The only person in the DEA office acquainted with Defendant was an officer who had attended the police academy with Defendant. It is unclear from the record whether that officer knew that Defendant was incarcerated. However, that officer was not initially involved in the investigation of this case.

4

as an inmate, and not a corrections officer, was when he and Defendant—who was wearing a red jumpsuit—were in detention together at Golden Grove. Navarro recounted that, while in detention, Defendant told "everybody" about his rape charge because he was embarrassed and wanted to explain his side of the story. At the time that Navarro learned about Defendant's rape charge, Navarro had been detained at Golden Grove for eighteen months and had been providing information to the DEA.

Following their encounter in detention, Defendant allegedly approached Navarro and told him that he wanted to hire a hitman to kill the people that had accused him of rape. Navarro explained that Defendant approached him, rather than somebody else at Golden Grove, because he carried himself in such a manner that people at Golden Grove trusted him. His demeanor was designed to disguise the fact that he was a confidential source for the DEA. Immediately after speaking with Defendant about a hitman, Navarro called Special Agent Gardner to report that Defendant is facing a rape charge in the Superior Court and that he wants to eliminate the witnesses. Special Agent Gardner did not know Defendant; she had to verify the information Navarro provided. Once Special Agent Gardner confirmed that Defendant had pending charges in the Superior Court, all further conversations between Navarro and Defendant were recorded.

In the recorded calls, Navarro and Defendant discussed the details of the murder-for-hire, including the price that Defendant was willing to pay for the hitman—$15,000. There were also discussions about a $500 down payment and the drop off of the down payment, which Navarro set up with the DEA. Navarro testified that, upon request by Defendant, Navarro asked his girlfriend to lend Defendant $500 for the hitman.[4] However, she refused. Navarro's girlfriend never gave

---

[4] Navarro explained that Defendant requested that Navarro ask his girlfriend for the $500 because Defendant knew, through Navarro, that Navarro's girlfriend was short on her rent, although she was in possession of $600.

5

Defendant the money.[5]

Shelbie Beazer ("Beazer"), a friend of Defendant, testified that she received a telephone call from Defendant, and that Defendant asked her to pick up money and drop it off into a designated vehicle. Beazer testified that Defendant told her to call the person with the money, and find out where to meet him. Beazer did as requested. She testified that she met a male in a parking lot and received money from him. She knew that she had received money because it was not in an envelope. She then drove to another parking lot where she dropped the money into the designated vehicle.[6] Beazer testified that she did not know where Defendant was when he called her; why Defendant asked her to pick up the money; how much money she actually received; or where the money came from.

According to Navarro, there was no "deal" between him and the DEA for the information he provided about Defendant. He testified that, by the time he was relocated from the Virgin Islands, he had already served the requisite amount of time for the crime he had committed.

## II. DISCUSSION

### A. Sixth Amendment

#### 1. Applicable Legal Principles

The Sixth Amendment prohibits the government from eliciting incriminating statements from an accused "after he has been indicted and in the absence of counsel." *Massiah v. United States*, 377 U.S. 201, 206 (1964). This right to counsel attaches upon the "initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment,

---

[5] Later, Navarro learned that his girlfriend was being deported, and advised her to call the DEA and tell the agent that she had, in fact, provided Defendant with $500 for a hitman. Navarro testified that this was a lie, the purpose of which was to prevent his girlfriend from being deported. Navarro thought, if his girlfriend testified against Defendant, she would be granted a visa to stay in the United States. However, the DEA did not believe the lie, and Navarro's girlfriend was eventually deported.

[6] Unbeknownst to Beazer, the vehicle that she dropped the money into was a DEA vehicle that was under surveillance.

information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689 (1972). However, the Sixth Amendment right to counsel is "offense specific" and "cannot be invoked once for all future prosecutions, for it does not attach until a prosecution is commenced . . . ." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991). Thus, "incriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at a trial of those offenses." *Maine v. Moulton*, 474 U.S. 159, 180 n.16 (1985); *accord Alston v. Redman*, 34 F.3d 1237, 1252 n.16 (3d Cir. 1994), *cert. denied*, 115 S. Ct. 1122 (1995).

In *Maine v. Moulton*, 474 U.S. 159 (1985), the Supreme Court explained the offense-specific nature of the Sixth Amendment right to counsel:

> The police have an interest in the thorough investigation of crimes for which formal charges have already been filed. They also have an interest in investigating new or additional crimes. Investigations of either type of crime may require surveillance of individuals already under indictment. Moreover, law enforcement officials investigating an individual suspected of committing one crime and formally charged with having committed another crime obviously seek to discover evidence useful at trial of either crime. In seeking evidence pertaining to pending charges, however, the Government's investigative powers are limited by the Sixth Amendment rights of the accused. . . . On the other hand, to exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached at the time the evidence was obtained, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities.

*Id*. at 179-80 (footnote omitted).

Several federal courts, including the Third Circuit, had read into the offense-specific definition an exception for crimes that are "factually related" to a charged offense. In *United States v. Arnold*, 106 F.3d 37 (3d Cir. 1997), the Third Circuit found that two Supreme Court cases, *Brewer v. Williams*, 430 U.S. 387 (1977) and *Maine v. Moulton*, 474 U.S. 159 (1985), "establish[ed] a limited exception to the 'offense specific' rule." *Arnold*, 106 F.3d at 40. In doing so, the Court held:

> [O]nce the right to counsel attaches with respect to a charged offense, it carries over to closely related but uncharged crimes. The reason underlying this exception is

7

>consistent with the purposes and protections of the Sixth Amendment. When the pending charge is so inextricably intertwined with the charge under investigation the right to counsel for the pending charge cannot constitutionally be isolated from the right to counsel for the uncharged offense. To hold otherwise would allow the government to circumvent the Sixth Amendment right to counsel merely by charging with additional related crimes after questioning him without counsel present.

*Id*. at 40-41 (footnote, citations, and internal quotation marks omitted).

In *Texas v. Cobb*, 532 U.S. 162 (2001), the Supreme Court rejected the view of the Third Circuit—and other courts—that the right to counsel on a charged offense extends to "closely related" but uncharged crimes. *Id*. at 168-172. Instead, with regard to uncharged crimes, the Supreme Court held that the Sixth Amendment applies to those "offenses" even if not formally charged that would be considered the "same offense" under the *Blockburger* test. *Id*. at 173 (citing *Blockburger v. United States*, 284 U.S. 299, 304 (1932)). Under *Blockburger*, "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304. Thus, the fact that the prior charge is "closely related" is not sufficient to extend the Sixth Amendment right to counsel to uncharged crimes.

### 2. Analysis

In the instant case, Defendant argues that the Government violated his Sixth Amendment right to counsel by engaging—through Navarro, a confidential source for the DEA and, as the Government conceded, a government agent—in an elaborate scheme of eliciting incriminating statements from him about his pending criminal case in the Superior Court, for which he was represented by counsel, to create a new, uncharged crime—murder for hire. Defendant contends that Navarro knew about his pending case in the Superior Court; approached him with the specific intent of eliciting his interest in hiring a hitman to kill the witnesses in the Superior Court case;

and deliberately created and orchestrated the murder-for-hire scheme to help his girlfriend escape deportation. Based on the evidence presented at the suppression hearing, and the applicable law, the Court finds that Defendant's claim that the Government violated his Sixth Amendment right to counsel is without merit.

It is well-established that if an informant elicits, in the absence of counsel, incriminating statements relating to a charged offense, the defendant is entitled to suppression of those statements. *See Massiah v. United States*, 377 U.S. 201, 206 (1964). However, the Sixth Amendment is "offense specific" and does not extend to the use of incriminating statements on uncharged offenses, even if they are "factually related" to the charged offense. *Cobb*, 532 U.S. at 167-68. The Government does not dispute that, at the time Defendant made the incriminating statements at issue, his Sixth Amendment right had attached with respect to the Superior Court rape case, for which he had been formally charged. However, Defendant had not been charged with the offenses that are the subject of this case—e.g., murder-for-hire. Therefore, there was no violation of Defendant's Sixth Amendment right to counsel when the DEA arranged for Navarro to record conversations with Defendant about the uncharged murder-for-hire plot.

Defendant argued at the suppression hearing, and in his supplemental brief, that the Supreme Court's decision in *Texas v. Cobb* is inapplicable here because, unlike the defendant in *Cobb*, Defendant had not committed murder at the time Navarro questioned him about the witnesses in his Superior Court case. However, the issue in *Cobb* was not whether the uncharged offense of murder had been committed, but whether the uncharged offense of murder was "the same" as the charged offense of burglary under the *Blockburger* test. *See Cobb*, 532 U.S. at 174. Here, Defendant conceded at the suppression hearing, and the law is clear, that the aggravated rape charge in the Superior Court is not "the same" as the offenses pending before this Court.

9

Under the *Blockburger* test, "[t]wo charges are 'the same' if they each punish 'the same act or transaction' and if all of the elements of one are also elements of the other." *United States v. Berryman*, 322 F. App'x 216, 224 n.3 (3d Cir. 2009) (quoting *Blockburger*, 284 U.S. at 304). In the Superior Court, Defendant is charged with Aggravated Rape in the Second Degree, in violation of 14 V.I.C. § 1700a(a).[7] In this Court, Defendant is charged with Use of Interstate Commerce Facility in Commission of Murder for Hire, in violation of 18 U.S.C. § 1958(a);[8] Attempted Murder First Degree, in violation of 14 V.I.C. §§ 331(1), 922(a)(1) and 923(a);[9] Attempted

---

[7] Section 1700a(a) of Title 14 of the Virgin Islands Code provides:

> Whoever perpetrates an act of sexual intercourse or sodomy with a person who is under eighteen years but thirteen years or older, or by force, intimidation, or the perpetrator's position of authority over the victim is used to accomplish the sexual act, is guilty of aggravated rape in the second degree and shall be imprisoned for life or for any term in years, but not less than 10 years.

14 V.I.C. § 1700a(a).

[8] Section 1958(a) of Title 18 of the United States Code provides, in relevant part:

> Whoever travels or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned not more than ten years, or both . . . .

18 U.S.C. §1958(a).

[9] Section 331(1) of Title 14 of the Virgin Islands Code provides:

> Whoever unsuccessfully attempts to commit an offense, shall, unless otherwise specially prescribed by this Code or other law, be punished by—
>
> > (1) Imprisonment for not more than 25 years, if the offense attempted is punishable by imprisonment for life.

14 V.I.C. § 331(1). Section 922(a)(1) of Title 14 of the Virgin Islands Code provides, in relevant part:

> All murder which—is perpetrated by means of poison, lying in wait, torture, detonation of a bomb or by any other kind of willful, deliberate, and premeditated killing; or is committed against . . . any person assisting a criminal investigation, while that assistance is being rendered . . . is murder in the first degree.

14 V.I.C. § 922(a)(1). Section 923(a) of Title 14 of the Virgin Islands Code provides:

> Whoever commits murder in the first degree shall be imprisoned for the remainder of his natural life without parole.

14 V.I.C. § 923(a).

Retaliation Against a Witness, in violation of 14 V.I.C. §§ 331(1) and 1510(a)(1);[10] and Possession of Prison Contraband, in violation of 18 U.S.C. §§ 1791(a)(2), (b)(3), (d)(1)(B).[11]

A review of the statutory elements of each offense reveals that the crime charged in the Superior Court is distinct from the crimes charged in this Court because each of the crimes charged here require proof of an element that the crime charged in the Superior Court does not. *See United States v. Rigas*, 605 F.3d 194, 204 (3d Cir. 2010) ("In *Blockburger*, the Supreme Court states, that 'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'") (quoting *Blockburger*, 284 U.S. at 304)). Therefore, notwithstanding that the crime charged in the Superior Court and the crimes charged in this Court stem from the same underlying event—i.e., the alleged rape—they are not "the same" offense for purposes of the Sixth Amendment.

At the suppression hearing, the Government represented that there are two recorded statements made by Defendant about his Superior Court case that were, "arguably," obtained in violation of Defendant's Sixth Amendment right to counsel. (Gov't Ex. Group 1A – March 9, 2015 at 8:45 p.m. and March 11, 2015 at 3:16 p.m.). The Government does not intend to introduce those

---

[10] Section 331(1) of Title 14 of the Virgin Islands Code provides as set forth in n.9, *supra*. Section 1510(a)(1) of Title 14 of the Virgin Islands Code provides, in relevant part:

> Whoever uses force, threat, or intimidation against any person called or to be called as a witness at any trial, proceeding, inquiry or investigation authorized by law relating to a felony . . . with intent to influence or prevent the testimony of such person or in retaliation for any testimony given, or any record, document or other object produced by such person shall be fined not more than $2,000, or imprisoned not more than ten years, or both.

14 V.I.C. § 1510(a)(1).

[11] Section 1791(a)(2), (b)(3), (d)(1)(B) of Title 18 of the United States Code provides, in relevant part:

> Whoever—in violation of a statute or a rule or order issued under a statute, provides to an inmate of a prison a prohibited object, or attempts to do so shall be [fined] or imprison[ed] for not more than 5 years, or both, if the object is a weapon (other than a firearm or destructive device), or an object that is designed or intended to be used as a weapon or to facilitate escape from a prison.

18 U.S.C. §§ 1791(a)(2), (b)(3), (d)(1)(B).

two statements at trial. Nonetheless, Defendant argues that all of the other recorded statements obtained by the Government are tainted by the, unconstitutionally obtained, statements about his Superior Court case.

Even if the two statements about Defendant's Superior Court case were obtained in violation of his Sixth Amendment right to counsel, the Supreme Court has stated that "[i]ncriminating statements pertaining to other crimes, as to which the Sixth Amendment right has not yet attached, are, of course, admissible at the trial of those offenses." *Maine v. Moulton*, 474 U.S. 159, 180 n.16 (1985). Accordingly, the two statements about Defendant's Superior Court case—even if obtained in violation of Defendant's Sixth Amendment right—do not affect the admissibility of the other statements.

In his supplemental brief, Defendant makes several arguments that are not supported by the facts developed at the suppression hearing or the governing law. First, Defendant argues that "Navarro knew that [Defendant] was charged with a sexual offense pending in Superior Court when Navarro approached [Defendant] at the Golden Grove Corrections Facility (GGCF)." (Dkt. No. 94 at 3). There is no evidence in the record that Navarro knew that Defendant had a case pending in the Superior Court or that Navarro approached Defendant. The record evidence reveals that Defendant spoke openly about his Superior Court case with "everybody" at Golden Grove; Defendant approached Navarro for assistance in hiring a hitman; and Defendant initiated discussions with Navarro about his Superior Court case.

Defendant also argues that Navarro, "[t]o create a believable case of murder for hire" against Defendant, "instructed his girlfriend to lie about the source of the $500 so she can remain in the United States." (*Id.*). Defendant contends that these facts demonstrate a "deliberate and elaborate plan by Navarro." (*Id*). Although Navarro—whose testimony the Court credits—testified that he told his girlfriend to lie and tell the DEA that she had provided Defendant with $500 to hire

12

a hitman, he also testified that it was Defendant who requested the $500 from his girlfriend, and that his girlfriend refused to give Defendant the money. Therefore, any scheme that Navarro may have devised to help his girlfriend stay in the United States developed *after* Defendant had solicited Navarro's assistance in hiring a hitman. Further, the testimony of Shelbie Beazer that she picked up money and dropped it into a vehicle at the request of Defendant belies any contention that the murder-for-hire plot was a plan that Navarro allegedly created to help his girlfriend stay in the United States.

Finally, despite being unable to provide the Court with any supporting case authority, Defendant contends that the facts and circumstances of this case are different from every other case involving a government informant that elicits incriminating statements about an uncharged offense because the murder-for-hire charge at issue here arose directly out of questions concerning his Superior Court case. (*Id*. at 1-2). In arguing that this case is unlike any other case, Defendant states that, at the time Navarro questioned him about the witnesses in his Superior Court case, the Government was not investigating an uncharged crime that had already been committed. (*Id*. at 2). Rather, Navarro elicited information from him to create a new crime. (*Id*.).

This argument is unfounded and contrary to the law governing the Sixth Amendment right to counsel. It is well-established that the Government has a duty and an obligation "to investigate suspected criminal activity, even in advance of the actual commission of a crime." *United States v. Mitcheltree*, 940 F.2d 1329, 1341 (10th Cir. 1991); *see also United States v. Terzado-Madruga*, 897 F.2d 1099, 1110-11 (11th Cir. 1990) (quoting *Maine v. Moulton*, 474 U.S. 159, 179-80 (1985)). As mentioned above, the DEA recorded conversations between Navarro and Defendant after Navarro informed Special Agent Gardner that Defendant wanted to eliminate the witnesses in his Superior Court case. Once the DEA learned of the possible murder-for-hire scheme, it had a duty and responsibility to investigate the suspected criminal activity. *See Terzado-Madruga*, 897

13

F.2d at 1112 (concurring with the district court's finding that the Government "acted properly in recording [the defendant's] conversations in an effort to investigate a possible plan to murder potential witnesses in [his] case"). Accordingly, the Court finds Defendant's argument that the Government cannot investigate an uncharged crime unless it has been committed unavailing.

In his Amended Motion to Suppress, and at the suppression hearing, Defendant also argued that the statements he made to DEA agents on October 8, 2015 were the "fruits" of the recorded conversations obtained in violation of his Sixth Amendment right to counsel. (*See* Dkt. No. 17 at 11-12). Because the Court has concluded that Defendant's Sixth Amendment claim has no merit, Defendant's "fruits of the poisonous tree" argument regarding his October 8, 2015 post-arrest statements fails as well. Accordingly, the Court will deny Defendant's Amended Motion to Suppress on Sixth Amendment grounds.

### B. Fifth Amendment

#### 1. Applicable Legal Principles

The Fifth Amendment provides criminal defendants with a right against self-incrimination. U.S. CONST. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself."). The Fifth Amendment right against self-incrimination, unlike the Sixth Amendment right to counsel, is not offense specific. *See Flamer v. Delaware*, 68 F.3d 710, 726 (3d Cir. 1995) (citing *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991)); *see also Alston v. Redman*, 34 F.3d 1237, 1243 (3d Cir. 1994) ("The [Fifth Amendment right to counsel] is not offense-specific. Rather, a suspect who has requested the presence of counsel cannot be questioned concerning *any* crime, not just the one that put him in custody.") (emphasis in original). Due to the absence of compulsion, the Fifth Amendment right against self-incrimination does not apply to noncoercive conversations with undercover government agents. *See, e.g.*, *Illinois v. Perkins*, 496 U.S. 292 (1990); *Hoffa v. United States*, 385 U.S. 293 (1966).

In *Illinois v. Perkins*, 496 U.S. 292 (1990), the Supreme Court held that an undercover law enforcement officer posing as a fellow inmate was not required to give *Miranda* warnings to an incarcerated suspect before eliciting incriminating information. *See id.* at 296-98. The Court explained that speaking with undercover government informants while incarcerated does not create a coercive atmosphere, and thus does not implicate the Fifth Amendment. *See id.* at 298 ("*Miranda* was not meant to protect suspects from boasting about their criminal activities in front of persons whom they believe to be their cellmates."). Similarly, in *Hoffa v. United States*, 385 U.S. 293 (1966), the Supreme Court held that placing an undercover agent in the presence of a suspect in order to gather incriminating information was permissible under the Fifth Amendment. *See id* at 303-04. In so holding, the Court found that "no claim ha[d] been or could [have been] made that [Hoffa's] incriminating statements were the product of any sort of coercion, legal or factual." *Id.* at 304 ("[A] necessary element of compulsory self-incrimination is some kind of compulsion").

**2. Analysis**

In the instant case, Defendant asserts, without explanation, that the Government violated his Fifth Amendment right to remain silent "when it purposefully sent an informant to inquire about witnesses in [his] pending Superior Court case." (Dkt. No. 94 at 7). However, the Supreme Court has rejected "the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent." *Perkins*, 496 U.S. at 297. This is because "[t]he essential ingredients of a 'police-dominated atmosphere' and compulsion are not present when an incarcerated person speaks freely to someone that he believes to be a fellow inmate." *Id.* at 296.

Defendant has not argued—nor could he—that the incriminating statements he seeks to suppress are the product of any coercion or compulsion. The evidence presented at the suppression hearing reveals that Defendant was unaware that Navarro was a confidential source for the DEA,

15

and, therefore, engaged in conversations with Navarro voluntarily. An incarcerated suspect who makes incriminating statements is not entitled to a *Miranda* warning of his Fifth Amendment right to remain silent "when the suspect is unaware that he is speaking to a law enforcement officer [or other government agent] and gives a voluntary statement." *Id*. at 294. Accordingly, the Court will deny Defendant's Amended Motion to Suppress on Fifth Amendment grounds.

### III.  CONCLUSION

For the foregoing reasons, the Court will deny Defendant's "Amended Motion to Suppress Statements and Recorded Phone Calls." (Dkt. No. 17).

An appropriate Order accompanies this Memorandum Opinion.

Date: August 12, 2016                    _____/s/_____
                                          WILMA A. LEWIS
                                          Chief Judge