**DISTRICT COURT OF THE VIRGIN ISLANDS**
**DIVISION OF ST. CROIX**

| | |
|---|---|
| UNITED STATES OF AMERICA and      )<br>PEOPLE OF THE VIRGIN ISLANDS      )<br>                               )<br>v.                        )<br>                               )<br>DELROY A. THOMAS,            )<br>                               )<br>         Defendant.         )<br>_____) | Criminal Action No. 2015-0039 |

Attorneys:
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the Government*

**Martial A. Webster, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

<u>**MEMORANDUM OPINION**</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on Defendant Delroy Thomas' ("Defendant") Motion for a New Trial ("Motion") (Dkt. No. 336) and the Government's Opposition thereto (Dkt. No. 340). For the reasons that follow, the Court will deny Defendant's Motion.

## I.      BACKGROUND

Following a jury trial, Defendant was convicted on July 18, 2019 of: Use of Interstate Commerce Facility in Commission of Murder for Hire, in violation of 18 U.S.C. § 1958(a); Attempted Murder in the First Degree, in violation of 14 V.I.C. § 922(a)(1); and Attempted Retaliation Against a Witness, in violation of 14 V.I.C. § 1510(a)(1). (Dkt. Nos. 334, 1).[1]

---

[1] Defendant was acquitted of Possession of Prison Contraband. (Dkt. Nos. 332, 1).

Thereafter, Defendant filed the instant Motion, and the Government filed its opposition. (Dkt. Nos. 336, 340).

A.      **Underlying Facts**

In support of his Motion—which Defendant brings pursuant to Rule 33 of the Federal Rules of Criminal Procedure—Defendant asserts that his Sixth Amendment right to an impartial jury was violated because the jury allegedly "considered extraneous evidence." (Dkt. No. 336-1 at 2). Additionally, Defendant argues that he has newly discovered evidence that the Government allegedly suppressed. *Id*. at 6. To place Defendant's arguments into context, the following summarizes the relevant facts developed at trial.

Special Agent Tracey Gardner ("Special Agent Gardner") of the Drug Enforcement Administration ("DEA") was the "handling agent" for Jason Navarro ("Navarro"), a former inmate at Golden Grove Adult Correctional Facility ("Golden Grove") who was a confidential source for DEA from October 2013 through March 2015. During that time, Navarro provided Special Agent Gardner with "general knowledge of criminal activity," specifically concerning contraband that was being smuggled into the prison.

On March 9, 2015, Navarro called Special Agent Gardner to inform her that he had been approached by Defendant, who was also incarcerated at Golden Grove at the time, and that Defendant had asked him if he knew of a hitman that could kill the witnesses in his Superior Court case. Upon receiving this information, Special Agent Gardner began an investigation; verified that Defendant had a case in the Superior Court of the Virgin Islands; and verified that the names of the witnesses in the Superior Court case matched the names Navarro had provided. With the assistance of Navarro, Special Agent Gardner recorded telephone conversations

between Navarro and Defendant, which were three-way calls made by Navarro to Defendant, with Special Agent Gardner listening on the line.

During one of the recorded conversations, Navarro asked Defendant if he was serious about the murder-for-hire. Defendant responded in the affirmative. Navarro continued by telling Defendant that, if he was serious, he had to send him photographs of the witnesses that he wanted killed. Defendant sent photographs to Navarro on March 10, 2015. Upon receipt of the photographs, DEA identified the individuals in the photographs as Defendant's alleged minor rape victim in his Superior Court case and the alleged victim's mother.

In the recorded calls, Navarro and Defendant also discussed the details of the murder-for-hire scheme, including the price that Defendant was willing to pay for the hitman. There were also discussions about a down payment as well as the drop off of the down payment, which Navarro set up with DEA.

It was Defendant's argument that Navarro and Golden Grove Corrections Officer Lucien Lake ("Officer Lake") plotted to frame him. Defendant testified that late one night, Officer Lake opened his cell door and Navarro walked into his cell with a knife and showed him a photograph of Defendant's two sisters and a video of his mother. According to Defendant, Navarro threatened Defendant that, if he did not go along with Navarro's plan to get a deal from DEA, Defendant's family "would be dead." Supposedly, a deal with DEA would result from Navarro providing DEA with information regarding criminal activity. Defendant testified that Navarro told him what he had to say in the telephone conversations with Navarro in order to accomplish that end. Defendant further testified that he was aware that DEA was listening in on his phone conversations with Navarro, but that he was going along with the "act" because he was fearful for his life and for the safety of his loved ones. Defendant also testified that Officer Lake was

involved in the money drop. Specifically, Defendant testified that Officer Lake retrieved the money from Navarro's girlfriend and then passed it on to an individual named Shelbie Beazer.

Both Special Agent Gardner and Navarro testified that there was no "deal" between Navarro and DEA for the information he provided about Defendant. They further testified that Officer Lake was not involved in the money drop. Shelbie Beazer testified that Defendant asked her to pick up and drop off some money and that she followed Defendant's instructions as to where to get the money and where to drop it off, although she did not know what the money was for. The money was dropped off to DEA agents—unbeknownst to Ms. Beazer—as part of the law enforcement undercover operation.

The Government also presented text messages that Defendant sent to Navarro containing photographs of the two female witnesses; text messages in which Defendant mentioned the two female witnesses by name; and a text message from Defendant stating that he will put a hit on the two female witnesses. In addition, the Government presented phone recordings between Defendant and Navarro, including a call in which Defendant referred to wanting the two witnesses killed in a murder-for-hire; another call in which Defendant discussed not taking any chances; a third call in which Defendant stated, "I want them off" and referred to getting a gun and having soldiers out there that could make the money drop; and a fourth call in which Defendant said that "this thing going down for sure," and stated that if Navarro wouldn't do it, he would find someone else. Additionally, the Government introduced text messages that Defendant sent prior to both the alleged threats by Navarro that Defendant claimed occurred and the recorded conversations. These text messages stated that Defendant "had this F-ing massacre up his sleeve"; identified Defendant's alleged victim and her mother; and expressed that

Defendant was putting money away in case he needed to put a "hit" on his alleged victim and her mother.

### B.    Newspaper Article

The jury trial for the instant case began on July 8, 2019. (Dkt. No. 336-1 at 2). The Court gave instructions in which it stated, inter alia, that the members of the jury were not to watch, read, or listen to any news reports concerning the trial on the television, radio, internet, or newspaper. The Court further elaborated that the only information members of the jury could consider when deciding the case was the evidence presented in court during the trial. The Court gave these instructions to the members of the jury after the jury was selected—but not yet sworn—and was being released for the night,[2] as well as the following morning after the jury was sworn.[3] The Court referred to these instructions as the "recess instructions," explaining that "[w]e're going to refer to [the detailed version of these instructions] as the recess instructions. It's

---

[2] The entirety of the instruction given before the jury was sworn was:

> While I do not know whether there is any news coverage of this case, do not watch or listen to any news reports concerning this trial on television or on radio, and do not read any news accounts of this trial in a newspaper or on the internet. Do not use the internet to search for information about the parties, witnesses, lawyers, or anyone else associated with the trial. Do not visit the scene of the alleged offense or conduct any kind of investigation on your own. The only information you are to consider in deciding this case is what you learn in this courtroom once the trial begins. So that's a critical instruction, because of the last statement that I made. The only information that you are to consider is what you learn in this courtroom.

[3] That morning, the Court reminded the jury of the instruction by stating:

> Remember, I gave you an instruction before we took our break last night that . . . confirmed and emphasized that . . . the only thing that you are to consider as evidence is what you hear in this courtroom. So anything you may have heard, seen, outside the courtroom—that's not evidence. You're to decide the case solely on the evidence presented here in the courtroom.

very important that you adhere to it, and every time we break, I'm going to tell you, recess instructions are in full force and effect, and this is what I'm going to mean by the recess instructions." The Court made it a practice to remind jurors that the recess instructions were in full force and effect whenever the Court stood in recess, at times making elaborations such as "no reading anything or anything of the sort." The Court would also periodically ask the members of the jury if they remembered the detailed version of the instructions or if they needed the Court to repeat them, and the jury would respond "[w]e remember."

On July 9, 2019, the Government entered into evidence a stipulation between the parties that informed the jury that in 2015, a pending Information in the Superior Court of the Virgin Islands existed that charged Defendant with a felony offense. The stipulation noted that "P.E. and Felicia Bennerson were witnesses in that matter." *Id*. However, by agreement of the parties and with the Court's approval, the stipulation did not specify the particulars of the offense in order to avoid any prejudice to Defendant. (Dkt. No. 340 at 2).

All evidence in the case was presented by July 15, 2019. *Id*. Jury deliberations commenced at approximately 5:30 p.m. on July 16, 2019, and ended for the evening at approximately 6:00 p.m., with the Court reminding the jury to abide by their recess instructions. *Id*. at 1; (Dkt. No. 340 at 2). The jury commenced deliberations at approximately 9:00 a.m. on July 17, 2019. (Dkt. No. 336-1 at 1). Later that day, the jury was called into court, reminded of their recess instructions, and released at approximately 2:15 p.m. because one of the jurors had a medical appointment. *Id*. The jury continued its deliberation on July 18, 2019 at approximately 9:00 a.m. and returned a verdict in the case at approximately 10:30 a.m.

On July 17, 2019, the day before the jury reached its verdict, the Virgin Islands Daily News published an article titled "Accused rapist on trial in St. Croix murder-for-hire plot." (Dkt.

No. 340 at 2; Dkt. No. 336-2). The article is one page long and starts out by stating that a "St. Croix man" was currently on trial in U.S. District Court for raping a minor and attempting to have her killed to keep her from testifying at trial. (Dkt. No. 336-2). The next sentence refers to Defendant "Delroy Thomas" by name, stating that he used a contraband cell phone in jail in order to hire someone to murder his minor rape victim, whom he impregnated, and her mother. *Id*. After listing the charges against Defendant, the article notes that jury selection in the current trial began on July 8, 2019, and that Tuesday marked the seventh day of the proceedings. *Id*. The article further specifies that U.S. District Court Chief Judge Wilma Lewis was presiding over the matter. *Id*. The remainder of the article details Defendant's plans for the murder, including that he wanted it to take place before he posted bail so that he could have an alibi. *Id*. Defendant asserts that, in addition to the Daily News, this news appeared "in other media and on the local radio." (Dkt. No. 336-1 at 2). Defendant does not specify the "other media" or the "local radio" which allegedly carried the story and to which he was referring. *Id*.

At the time the article was published, the Court was not aware of its existence. The Court first became aware of the article with the filing of Defendant's Motion for a New Trial. Defendant's counsel represents that he was unaware of the article at the time it was published. *Id*. at 1-2.

### C.    The Alleged Newly Discovered Evidence

On July 6, 2019, the Saturday before trial began, the Government sent Defendant's counsel an email which attached a call log that showed calls on March 11, 2015 between the phone number associated with Navarro and the phone number associated with Officer Lake. (Dkt. Nos. 336-1 at 5; 336-3). Defendant asserts that this evidence is material because Defendant could have presented an exhibit at trial that showed Navarro's call log as a means of impeaching

Navarro. *Id*. at 6. Navarro testified that Officer Lake was not involved in "the money drop." *Id*. Therefore, according to Defendant, these call log would impeach Navarro because they reflect multiple "calls between [Navarro] and the telephone number associated with Lucien Lake on March 11, 2015, between the hours of 23:33:58 and 23:40:21, i.e., during the period of the 'money drop.'" *Id*. Defendant further argues that he could have impeached Special Agent Gardner with this information as well because Special Agent Gardner monitored the money drop and testified that Officer Lake was not involved in it. *Id*. at 7.

Defendant asserts that his counsel did not see this email until after trial. *Id*. Defendant further stresses that the Government did not "bring the matter to defense counsel['s] attention before or during trial." *Id*. at 5. According to Defendant, this evidence was presented too late for it to "be of any use in the preparation of his defense . . . ." *Id*. at 6. Defendant states that the reason why his counsel did not see the evidence until after trial is "because of the manner in which the information was produced." *Id*.

The Government asserts that it requested the call log from the case agent the week before trial began after learning that Defendant was making the argument that Officer Lake participated in the money drop. (Dkt. No. 340 at 12). The case agent obtained the requested material on July 5, 2019 and emailed it to the undersigned U.S. Attorney on July 6, 2019—the same day on which it was disclosed by the Government. (Dkt. Nos. 336-3, 340 at 12).

## II.   APPLICABLE LEGAL PRINCIPLES

### A.   Rule 33

A motion for a new trial is properly made under Fed. R. Crim. P. 33(a), which provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." This rule generally gives the district court broad discretion in

determining whether a new trial is appropriate. *See United States v. Jasin*, 280 F.3d 355, 360 (3d Cir. 2002); *Gov't of Virgin Islands v. Commissiong*, 706 F. Supp. 1172, 1184 (D.V.I. 1989). "[T]he Third Circuit has implied in its jurisprudence that a Rule 33 Motion is not a forum for litigating issues that could have been raised prior to or during trial." *United States v. Stradford*, No. 06-CR-275, 2008 WL 2275999, at \*3 (D.N.J. May 30, 2008), *aff'd*, 394 F. App'x 923 (3d Cir. 2010) (citing *United States v. Pelullo*, 105 F.3d 117, 126-27 (3d Cir. 1997)). Rule 33 Motions should be "granted sparingly and only in exceptional cases." *Gov't of Virgin Islands v. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987).

**B.     Sixth Amendment Right to Impartial Jury**

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." U.S. CONST. amend. VI. The Third Circuit has defined an impartial jury as "nothing more than 'jurors who will conscientiously apply the law and find the facts.'" *United States v. Jones*, 566 F.3d 353, 358 (3d Cir. 2009) (emphasis omitted) (quoting *Lockhart v. McCree*, 476 U.S. 162, 178 (1986)). In order to be impartial, the jury must base its verdict only "on evidence received in open court, not from outside sources." *Sheppard v. Maxwell*, 384 U.S. 333, 351 (1966).

In the context of prejudicial publicity, a new trial should be ordered if publicity during proceedings "threaten[ed] the fairness of the trial." *Sheppard*, 384 U.S. at 363. However, jurors need not be completely unexposed to media coverage of a case in order to withstand a challenge to their impartiality. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *Gov't of the Virgin Islands v. Dowling*, 814 F.2d 134, 139 (3d Cir. 1987) (finding that "not every exposure to extra-record information about the case will require a new trial . . . ."). In fact, the Supreme Court has noted that insisting that jurors be entirely ignorant of all adverse publicity is impossible "in these days

of swift, widespread and diverse methods of communication . . . ." *Id*. Instead, it is enough if a juror can "render a verdict based on the evidence presented in court," rather than information received from outside sources. *Id*. at 723.

In determining whether news influenced the jury in a prejudicial manner, courts use the following three-step analysis: (1) "whether the news coverage is prejudicial"; (2) "whether any jurors were exposed to coverage"; and (3) "if exposure did occur, . . . if this exposure compromised [the exposed jurors'] impartiality." *United States v. DiSalvo*, 34 F.3d 1204, 1221-22 (3d Cir. 1994) (quoting *Waldorf v. Shuta*, 3 F.3d 705, 709 (3d Cir. 1993)). When conducting this analysis, courts will look at the totality of the circumstances to determine whether a defendant's trial was fundamentally fair. *Murphy v. Florida*, 421 U.S. 794, 799 (1975). A court may only grant a new trial "if there was a substantial likelihood of prejudice." *United States v. Lloyd*, 269 F.3d 228, 243 (3d Cir. 2001).

A court cannot presume that a defendant's due process rights have been violated based on mere juror exposure to adverse publicity. *Murphy*, 421 U.S. at 799. A court will only presume prejudice to a defendant where "media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process . . . ." *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992); *see also Hetzel v. Lamas*, 630 F. Supp. 2d 563, 570 (E.D. Pa. 2009), *aff'd*, 372 F. App'x 280 (3d Cir. 2010) ("The community and media reaction [must be] so hostile and so pervasive that it is apparent even the most careful *voir dire* process would be unable to assure an impartial jury."). When such a trial atmosphere does not exist, the burden is on the defendant to establish that his right to an impartial jury has been violated by demonstrating that the members of his jury "lacked a capacity to reach a fair and

impartial verdict based solely on the evidence they heard in the court room." *Zimmerman*, 959 F.2d at 1253.

C.    **Newly Discovered Evidence**

A defendant must satisfy five requirements to demonstrate his entitlement to a new trial based on newly discovered evidence. Specifically, a "defendant must (1) identify newly discovered evidence; (2) allege facts from which his diligence can be inferred; (3) demonstrate the evidence is not merely cumulative or impeaching; (4) show the evidence is material to the issues involved; and (5) show the evidence is such that, if introduced at trial, it would probably produce an acquittal." *United States v. Napolitan*, 762 F.3d 297, 305 (3d Cir. 2014) (citing *United States v. Kelly*, 539 F.3d 172, 181-82 (3d Cir. 2008)).

The Third Circuit also concluded that newly discovered evidence need not go directly to guilt or innocence. *United States v. Richards*, 241 F.3d 335, 343 (3d Cir. 2001). Accordingly, evidence of juror misconduct or of a *Brady* violation may provide a basis for a Rule 33(b)(1) motion, as long as the evidence is in fact "newly discovered and . . . the defendant's failure to discover the information during the trial was not a result of lack of diligence . . . ." *Id.*; *see also United States v. Gutierrez-Calderon*, No. 2016-CR-0009, 2019 WL 3859753, at *10 (D.V.I. Aug. 16, 2019).

The Third Circuit has also found that impeaching evidence should not be removed from the scope of Rule 33 where there is a "claim that there has been a miscarriage of justice . . . ." *United States v. Quiles*, 618 F.3d 383, 391-92 (3d Cir. 2010) (citing *United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992) ("In some situations . . . the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible.")); *see also United States v. Lewis*, 447 F. App'x 310, 314

11

(3d Cir. 2011). In these cases, a court should look to whether there is a "strong exculpatory connection between the newly discovered evidence and the facts that were presented at trial" or whether "the newly discovered evidence strongly demonstrated that critical evidence against the defendant was very likely false." *Quiles*, 618 F.3d at 393.

>   D.   ***Brady* Violations**

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . ." *Id*. at 87. As the Third Circuit has noted:

> To prove a *Brady* violation, a defendant must show that the evidence at issue meets three critical elements. First, the evidence "must be favorable to the accused, either because it is exculpatory, or because it is impeaching." [*Strickler v. Greene*, 527 U.S. 263, 281-84 (1999)]. Second, it "must have been suppressed by the State, either willfully or inadvertently." [*Id*. at 282]. Third, the evidence must have been material such that prejudice resulted from its suppression. *Id*.

*Dennis v. Sec'y, Pa. Dep't of Corrs.*, 834 F.3d 263, 284-85 (3d Cir. 2016) (internal citations omitted). In *Kyles v. Whitley*, 514 U.S. 419, 419 (1995), the Supreme Court explained that the "touchstone of materiality is a 'reasonable probability' of a different result . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. at 434. In other words, courts examine whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id*. (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)).

While "[t]he materiality of *Brady* material depends almost entirely on the value of the evidence relative to the other evidence mustered by the state," *Johnson v. Folino*, 705 F.3d 117, 129 (3d Cir. 2013) (quoting *Rocha v. Thaler*, 619 F.3d 387, 396 (5th Cir. 2010)), materiality for

*Brady* purposes "is not a sufficiency of evidence test." *Kyles*, 514 U.S. at 434. "The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict." *Id.* at 435. Instead, a *Brady* violation is established through a showing that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*

There can be no violation of *Brady* without a finding of prejudice. *United States v. Bansal*, 663 F.3d 634, 670 (3d Cir. 2011) (citing *Strickler*, 527 U.S. at 281-82). "'Where the government makes *Brady* evidence available during the course of a trial in such a way that a defendant is able to effectively use it, due process is not violated and *Brady* is not contravened.'" *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013) (quoting *United States v. Johnson*, 816 F.2d 918, 924 (3d Cir. 1987) (citations omitted)); *see also United States v. Kubini*, 19 F. Supp. 3d 579, 627 (W.D. Pa. 2014) ("The law is firmly established that 'no denial of due process occurs if *Brady* material is disclosed to a criminal defendant in time for its effective use at trial.'") (quoting *United States v. Higgs*, 713 F.2d 39, 44 (3d Cir. 1983), *cert. denied*, 464 U.S. 1048 (1984))).

The burden of establishing a *Brady* violation falls on the defendant. *Maynard v. Gov't of the Virgin Islands*, 392 F. App'x 105, 119 (3d Cir. 2010) (citing *United States v. Pelullo*, 399 F.3d 197, 209 (3d Cir. 2005)). Ordinarily, the remedy for a *Brady* violation that impacted the judgment of a jury is a retrial. *Gov't of Virgin Islands v. Fahie*, 419 F.3d 249, 252 (3d Cir. 2005).

## III. DISCUSSION

### A. The Impartiality of the Jury

Defendant argues that because the jury allegedly "considered extraneous evidence," his Sixth Amendment right to an impartial jury was violated. (Dkt. No. 336-1 at 2). Specifically,

Defendant asserts that he is entitled to a new trial because a newspaper article was released during jury deliberations which stated that he was on trial for raping and impregnating a minor and seeking to have her and her mother killed to prevent them from testifying. *Id*. In support of his argument, Defendant points out that St. Croix is a "very small community." *Id*. at 5. He emphasizes that the jury was let out early on the day that the article was published and that the Court instructed the jury members to remember their recess instructions instead of repeating the specific instructions. *Id*. Defendant further contends that "[w]hether intentionally or not, the jurors were exposed to the media story, directly or indirectly." *Id*. In concluding, Defendant states that the day after the article was published, the members of the jury were "permitted to re-enter the deliberation room . . . without any questioning or interrogation" and returned a verdict in less than one hour. *Id*. For those reasons, Defendant asserts that the Court should grant him a new trial. *Id*. at 7.[4]

Defendant has failed to show that his Sixth Amendment right to an impartial jury was violated. In particular, Defendant has failed to establish that any jurors were exposed to prejudicial news coverage, and that, if they were exposed, such exposure prevented them from being impartial. *DiSalvo*, 34 F.3d at 1221-22.

---

[4] Defendant notes that when the impartiality of a jury is being challenged, "the remedy is *generally* a hearing . . . ." (Dkt. No. 336-1 at 3) (emphasis added). However, it is clear that hearings are not always necessary or required. *United States v. Console*, 13 F.3d 641, 669 (3d Cir. 1993) (finding that allegations of juror exposure to prejudicial extra-record information do not automatically require a court to conduct a hearing). Indeed, the Third Circuit has stated that "[j]urors who complete their service should rarely, if at all, be recalled for [such] proceedings . . . ." *United States v. Gilsenan*, 949 F.2d 90, 97-98 (3d Cir. 1991) ("We are always reluctant to 'haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'") (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) (citations omitted)); *see also United States v. Stewart*, 433 F.3d 273, 306 (2d Cir.2006) ("[A]n evidentiary hearing is not held to afford a convicted defendant the opportunity to conduct a fishing expedition."). The Court concludes that a hearing is not necessary under the circumstances here.

Defendant's argument that his Sixth Amendment right to an impartial jury has been violated is premised on nothing more than mere assumptions. First, Defendant simply *assumes* that a member or members of the jury were exposed to the news coverage of the trial.[5] In order to establish that members of the jury were exposed to prejudicial news coverage, there must be an "affirmative reason to believe that a member or members of the jury may have learned extra-record information about the underlying facts of the case." *See Dowling*, 814 F.2d at 138. For example, in *Dowling*, a juror in a bank robbery trial informed the district court that the jury had been exposed to extra-record information about the facts of the case and about the defendant's past criminal record, which included a prior conviction for bank robbery. *Id.* at 135. Here, unlike in *Dowling*, there has been no showing that any member of the jury was actually exposed to the news coverage in question. Notwithstanding the existence of the newspaper article and Defendant's unsupported assertion that the news appeared "in other media and on the local radio," one cannot simply assume that the jurors were even aware of the news coverage, let alone actually exposed to it. That juror awareness cannot be deemed to be a foregone conclusion is of particular importance here in light of the fact that neither counsel for Defendant nor the Court were aware of either the article or the purported coverage "in other media and on the local radio." Defendant's mere assumptions—without more—that a member or members of the jury were exposed to the news coverage renders Defendant's argument fatally flawed. *Gilsenan*, 949 F.2d at 97.

---

[5] The newspaper article identifies the underlying felony offense that Defendant was charged with in Superior Court. This is a fact that the parties and the Court agreed not to disclose to the jury to avoid any prejudice to Defendant. Accordingly, for purposes of the Sixth Amendment analysis, the Court will deem the news coverage to be prejudicial. Thus, the first step of the analysis— whether the news coverage is prejudicial—will be deemed to be answered in the affirmative.

Moreover, even assuming that the jurors were aware of the existence of a newspaper article or other alleged news coverage, the jurors were instructed at the outset of the trial that they were not to watch or listen to any news reports concerning the trial on the television or on the radio, and not to read any news accounts of the trial in a newspaper or on the internet. They were further instructed that the only evidence they could consider was evidence presented in court. The jurors were regularly reminded of these instructions—referred to as their "recess instructions"—before any break.[6] And, as Defendant acknowledges, the jury was reminded of these instructions when the Court stood in recess on the day that the newspaper article appeared. (Dkt. No. 336-1 at 5). There is no reason to believe that the jurors did not adhere to these instructions.

That Defendant's argument fails is further confirmed by the fact that Defendant did not produce any evidence that, *if* exposed to the article, any jury member lacked the ability to set aside evidence from outside sources and consider only evidence presented during trial when rendering his or her decision. *Zimmerman*, 959 F.2d at 1252; *see also Hetzel*, 630 F. Supp. 2d at 563 (finding that the defendant failed to demonstrate that the jury members were not impartial, in part because the defendant made "no attempt to demonstrate actual prejudice."). Having been instructed that they could consider only evidence presented in court in rendering their decision and with nothing to indicate that the jurors did not adhere to these instructions, there is no basis to conclude that the jurors were rendered incapable of deciding the case based solely on the evidence presented in court or that they were otherwise unable to "conscientiously apply the law

---

[6] While Defendant appears to take issue with the Court's reference to "recess instructions," (Dkt. No. 336-1 at 2), Defendant has presented no authority for the proposition that the Court was precluded from reminding jurors of the instructions at issue by referring to them as recess instructions. Indeed, whenever the Court asked the jury if they remembered the detailed instructions or needed the Court to repeat them, they would state that they remembered them.

and find the facts." *United States v. Jones*, 566 F.3d 353, 358 (3d Cir. 2009) (internal quotations omitted); *see also Riley v. Taylor*, 277 F.3d 261, 300 (3d Cir. 2001) (finding that the defendant had the onus of demonstrating that the members of the jury lacked the capacity to consider only the evidence presented in court to reach a fair and impartial verdict). Accordingly, Defendant has presented nothing to suggest that, *if* exposed to prejudicial publicity, the jurors' impartiality was compromised. *DiSalvo*, 34 F.3d at 1221-22.

Finally, there is nothing in the record to suggest that "there was a substantial likelihood of prejudice." *Lloyd*, 269 F.3d at 243. Nor does the situation presented here constitute one of the "exceedingly rare" instances in which the atmosphere was so hostile that prejudice must be presumed. *Zimmerman*, 959 F.2d at 1252. Indeed, courts within the Third Circuit have found that much more extensive and seemingly prejudicial publicity than that presented here did not warrant a presumption of prejudice. *Marinelli v. Beard*, No. 07-CV-0173, 2012 WL 5928367, at *64 (M.D. Pa. Nov. 26, 2012) (concluding that there was an absence of facts to demonstrate a presumption of prejudice where there were numerous newspaper articles published about the case and television coverage about the case on local and regional news that spanned about half a year); *Karenbauer v. Klem*, No. 05-CV-1586, 2009 WL 473860, at *21 (W.D. Pa. Feb. 25, 2009), *aff'd sub nom.*, 390 F. App'x 73 (3d Cir. 2010) (finding no presumption of prejudice after considering evidence such as media coverage that included the defendant's confessions). For example, the court in *Hetzel*, 630 F. Supp. 2d, found that a presumption of prejudice was not warranted even though seventy-two articles had been published concerning the murder case, many of which described the murder in gruesome detail, because "none of the articles were sensational or demanded a conviction." *Id*. at 571. In the instant case, only information reflected

in one single-page article is in question, and this article is neither sensational nor does it demand conviction. There is simply no basis for presuming prejudice under the circumstances here.

In view of the foregoing, the Court concludes that Defendant has failed to establish that his Sixth Amendment right to an impartial jury was violated.

### B.     The Alleged Newly Discovered Evidence

Defendant also argues that he is entitled to a new trial because of newly discovered evidence. (Dkt. No. 336-1 at 5). Defendant alleges that Navarro's call log, which shows calls during the time of the money drop between phone numbers associated with Navarro and Officer Lake, "was necessary" for Defendant "to prepare a proper defense." *Id*. at 6. According to Defendant, if he had that evidence, the outcome of the case could have been different because he could have impeached Special Agent Gardner and Navarro, who both testified that Officer Lake was not involved in the money drop. *Id*. at 6-7. The Court finds that Defendant has failed to carry his burden of establishing that he is entitled to a new trial based on newly discovered evidence.

First, "[e]vidence is not 'newly discovered' if it 'was [actually] known or could have been known by the diligence of the defendant or his counsel.'" *United States v. Cimera*, 459 F.3d 452, 461 (3d Cir. 2006) (quoting *United States v. Bujese*, 371 F.2d 120, 125 (3d Cir. 1967)). While Defendant states that his counsel did not see the email sent by Government counsel with the attached call log until after trial, the question remains whether the email could have been seen with reasonable diligence. Here, the Government states that it requested the call log the week before trial began after learning that Defendant was alleging that Officer Lake was involved in the money drop. The Government represents that it sent defense counsel the call log via email the same day it received the call log from the case agent—the Saturday before trial began. Under these circumstances, including the fact that there were seven trial days, the Court

concludes that "as an objective matter[—this] evidence could have been discovered before the close of trial with the exercise of reasonable diligence." *Cimera*, 459 F.3d at 461. Accordingly, Defendant has not shown that his "failure to discover the information during the trial was not a result of lack of diligence . . . ." *Richards*, 241 F.3d at 343.[7] On this ground alone, Defendant's request for a new trial based on newly discovered evidence fails.

Defendant also has not established that there has been a miscarriage of justice such that the evidence is not merely impeaching. As a preliminary matter, whether this evidence is impeaching is questionable. In order to reach the conclusion that Navarro lied about Officer Lake being involved in the money drop, one would have to conclude that, because one can infer from the call log that Navarro called Officer Lake during the time that the money drop was occurring, Navarro was in fact discussing Officer Lake's involvement in the money drop with him. Further, in order to reach the conclusion that Special Agent Gardner also lied about Officer Lake's involvement, one would have to infer not only that the phone call concerned Officer Lake's involvement in the money drop, but also that Special Agent Gardner was aware of this phone call and the substance thereof. These multiple layers of assumptions render the impeachment value of the evidence questionable.

---

[7] The Third Circuit has found that defendants did not exercise reasonable diligence in situations that required more diligence than was required here. *See, e.g., Napolitan*, 762 F.3d at 307 (3d Cir. 2014) (holding that a defendant was not diligent in discovering that two of the witnesses at his trial were providing false testimony because there were multiple avenues available for him to determine this during trial, most notably by asking them direct questions); *United States v. Kelly*, 539 F.3d 172, 184 (3d Cir. 2008) (determining that a defendant who did not make an effort to obtain his acquaintance's testimony in time for trial did not act diligently in discovering the acquaintance's later exculpatory statement, particularly because the acquaintance was present during the defendant's arrest); *Iannelli*, 528 F.2d at 1293 (holding that the defendants did not diligently pursue whether court-ordered electronic surveillance was fraudulent because their counsel could have subjected the "initials to expert handwriting analysis" before trial ended).

Even assuming that the call log would impeach Navarro and/or Special Agent Gardner's testimony on the issue of Officer Lake's involvement with the money drop, Defendant has failed to establish that the call log evidence would have "totally undermined critical inculpatory evidence," *Quiles*, 618 F.3d at 392, so as to render its absence a miscarriage of justice.[8] The case of *United States v. Lipowski*, 423 F. Supp. 864, 867 (D.N.J. 1976), helps to illustrate the point. In *Lipowski*, the Government heavily relied on tape recordings that its primary witness had made. However, after trial, the defendant discovered that the witness had manufactured the tape. *Id*. This prompted the court to grant the defendant a new trial because it found that the newly discovered evidence not only seriously implicated the truth of the witness' testimony, but also cast "serious doubt over the authenticity of the tapes introduced into evidence." *Id*. at 868.

The circumstances here are markedly different than in *Lipowski*. Unlike the tape recordings in *Lipowski* on which the Government heavily relied and which were undermined by the newly discovered evidence, the testimony by Navarro and Special Agent Gardner that Officer Lake was not involved in the money drop was of marginal significance to the Government's case, and thus was not critical inculpatory evidence.

The critical inculpatory evidence against Defendant started with text messages sent by Defendant *before* any alleged threats by Navarro or alleged involvement by Officer Lake.[9] These text messages stated that Defendant "had this F-ing massacre up his sleeve"; identified Defendant's alleged victim and her mother; and stated that he was putting money away in the

---

[8] The other prong of the analysis is whether Defendant has established the "necessary exculpatory connection between the evidence and the offense . . . ." *Quiles*, 618 F.3d at 392. However, other than stating the legal principle that applies to *Brady* analyses, Defendant has not claimed, nor provided any argument, that the call log evidence is exculpatory.

[9] Defendant's theory that Navarro and Officer Lake plotted to frame him and that Navarro directed all of his actions does not account for the fact that the critical inculpatory evidence started before any alleged involvement by Navarro and Officer Lake.

event that he needed to hire a hitman for the two female witnesses. The critical inculpatory evidence continued with a text message that Defendant sent Navarro containing a picture of the two female witnesses; text messages in which Defendant referred to the two female witnesses by name; and a text message from Defendant stating that he will put a hit on his victim and her mother. There were also the phone call recordings, wherein Defendant: stated his desire to have the two witnesses killed; discussed not taking any chances; stated "I want them off"; referred to getting a gun and having soldiers out there that could make the money drop; communicated that "this thing going down for sure"; and stated that if Navarro wouldn't do it, he would find someone else. And, there was Shelbie Beazer's testimony that it was Defendant who asked her to pick up and drop off the down payment for the money drop. This evidence in the aggregate would not have been undermined—let alone totally undermined—by Officer Lake's alleged involvement in the money drop, wherein Defendant claims that Officer Lake picked up the money from Navarro's girlfriend and provided it to Shelbie Beazer. Thus, even assuming that the call log can be deemed to be impeaching, Defendant has not established that the call log would have totally undermined critical inculpatory evidence. This defect is also fatal to Defendant's claim of newly discovered evidence.

Finally, if Defendant had introduced the call log at trial, it probably would not have resulted in an acquittal. *United States v. Rutkin*, 208 F.2d 647, 654 (3d Cir. 1953) (finding that newly discovered evidence must "be of such character as would probably produce acquittal."). Even if Officer Lake was involved in the money drop, and Navarro and Special Agent Gardner's testimonies were impeached on that issue, an acquittal would still have been highly unlikely. As discussed above, there was a wealth of evidence introduced by the Government at trial. In view of that evidence, the nature of the call log evidence is not such that an acquittal would probably

have resulted had the call log been introduced at trial. For this additional reason, Defendant's newly discovered evidence argument fails.

In view of the foregoing, the Court concludes that Defendant has failed to establish that he is entitled to a new trial based on newly discovered evidence.

### C.   The Alleged *Brady* Violation

Defendant further alleges that the Government suppressed the call log, resulting in a *Brady* violation. (Dkt. No. 336-1 at 5). However, the Court finds that Defendant's *Brady* argument fails because Defendant has not established that the Government suppressed the evidence or that the alleged suppression of the evidence resulted in prejudice.[10]

First, the record does not support the contention that the Government willfully or inadvertently suppressed evidence. The Government emailed the call log to Defendant's counsel the weekend before trial began. *See United States v. Schneider*, 801 F.3d 186, 202 (3d Cir. 2015) (finding that the defendant failed to establish that the evidence in question was suppressed in part because the government emailed the evidence to the defendant's counsel on the second day of trial). The government does not violate *Brady* when it makes evidence available to a defendant such that the defendant is able to use the evidence effectively at trial. *Moreno*, 727 F.3d at 262 (finding that the government did not suppress evidence that it disclosed to the defendant the evening before trial began because the defendant had the opportunity to use it during trial). If it were not for defense counsel's failure to check his email the weekend before trial began or during the course of the seven trial days, he would have been able to use the call log at trial as he deemed appropriate. Thus, the Government did not suppress the evidence under the circumstances presented here, and the *Brady* claim therefore fails.

---

[10] In addition, as noted earlier, Defendant has not argued that the call log evidence is exculpatory, and whether it is impeaching is questionable.

Second, Defendant has not shown that the evidence is "material such that prejudice resulted from its suppression." *Dennis*, 834 F.3d at 285. Based on the evidence presented at trial, the Court cannot conclude that the call log—given its nature and connection to the case—"could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. Accordingly, the Court finds that Defendant has failed to satisfy the materiality prong of *Brady*.

For the foregoing reasons, the Court concludes that Defendant has failed to establish that the Government committed a *Brady* violation.

## IV.    CONCLUSION

For the reasons discussed above, the Court will deny Defendant Delroy Thomas' Motion for a New Trial (Dkt. No. 336). Specifically, Defendant's Motion will be denied because: (1) Defendant has failed to show that his Sixth Amendment right to an impartial jury was violated; (2) Defendant has failed to show that he is entitled to a new trial due to newly discovered evidence; and (3) Defendant has failed to establish that the Government committed a *Brady* violation.

An appropriate Order accompanies this Memorandum Opinion.

Date:   July 10, 2020                          _____/s/_____
                                               WILMA A. LEWIS
                                               Chief Judge